UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAMIEN CORBETT,                          )
                                         )
            Petitioner,                  )
                                         )
      v.                                 )        2:15-cr-00031-GZS
                                         )        2:18-cv-00493-GZS
UNITED STATES OF AMERICA,                )
                                         )
            Respondent                   )

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION
AND MOTION FOR NEW TRIAL**

Petitioner moves pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his

sentence.  (Section 2255 Motion, ECF No. 121; Motion for a New Trial, ECF No. 123).

Following a jury trial, Petitioner was convicted of conspiracy to distribute and possess with

intent to distribute oxycodone and oxymorphone; the Court sentenced Petitioner to 100

months in prison.  (Judgment, ECF No. 86.)  The First Circuit affirmed.  *United States v.*

*Corbett*, 870 F.3d 21 (1st Cir. 2017).

Petitioner claims his counsel was constitutionally ineffective for not investigating

or objecting to certain video and audio recordings introduced at trial, and for failing to

request or object to certain jury instructions. (Section 2255 Motion at 4–8.) The

Government requests dismissal of the motions.  (Response, ECF No. 140.)

Following an evidentiary hearing, a review of the record, and after consideration of

Petitioner's motions and the Government's request for dismissal, I recommend the Court

grant the Government's request and deny Petitioner the relief requested.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A.     Investigation**

In 2014, law enforcement officials arranged for several controlled buys of oxycodone pills from two individuals, Taysha Gillis and Kenneth Gerrish.  Gillis and Gerrish were arrested in December 2014 and law enforcement found hundreds of pills inside two safes in Gillis' bedroom closet.  Gillis and Gerrish identified Petitioner as the source of the pills.  Gillis, working with law enforcement, arranged to meet with Petitioner purportedly to repay Petitioner for his share of the proceeds from selling pills that Petitioner had provided.

On December 19, 2014, Petitioner and Gillis, who wore two hidden devices to record the audio of the conversation, met in a parking lot.  The pair conversed in Petitioner's vehicle and placed their cell phones in the other vehicle while they talked.  At the end of the conversation, Gillis gave Petitioner $2,560 and left Petitioner's vehicle, at which point law enforcement officers arrested Petitioner.  After his arrest, Petitioner was taken to the Kittery police station, where he was advised of his *Miranda* rights and interviewed by law enforcement for approximately fifteen minutes.  A recording of the interview was made using the video recording system at the Kittery police station.

**B.     Criminal Proceedings**

In January 2015, Petitioner was indicted on one count of conspiracy to distribute and possess with intent to distribute oxycodone and oxymorphone between June 2013 and December 2014 in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).  (Indictment, ECF No. 1.)  A jury trial was held over three days in December 2015.

The Government called a law enforcement officer, Mark Clifford, to testify about the drug trafficking investigation that led to the arrests of Gillis and Gerrish. (Trial Transcript at 39–61, ECF No. 101.)  The Government also introduced in evidence an audio recording of the conversation between Gillis and Petitioner, (Trial Exhibit 6), and provided the jury with a transcript, (Trial Exhibit 6-T), which the officer asserted was a true and accurate transcript of the audio recording.  (Trial Transcript at 61–65, 68-69.)  The officer noted that sections of the audio were unintelligible because the radio was turned on in the car. (*Id.*)  Before trial, the Court granted an uncontested motion in limine from Petitioner to exclude an "enhanced" version of that audio recording, (Order, ECF No. 61), but no objection was offered to the version of the audio introduced at trial or to the use of the transcript.

Gillis testified at trial that Petitioner supplied pills multiple times for her to sell.  (*Id.* at 97–148.)  Gerrish testified that he obtained pills from Gillis to sell and that he had observed Gillis obtaining pills from Petitioner on several occasions.  (*Id.* 182–202.)  The Government played for the jury selected parts of the audio recording from the conversation between Petitioner and Gillis in Petitioner's car, and the Government questioned Gillis about the portions of the audio and the transcript. (*Id.* 134–48.)  Before allowing the Government to play portions of the audio exhibit, the Court instructed the jury:

> All right, ladies and gentlemen of the jury, you're going to be provided with a transcript of certain tape recordings that are going to be played.  I want to caution you that this transcript is being given to you to assist you in listening.  It's not the transcript that's evidence.  It is the tape recording that is the evidence and if you see anything different from what's in the transcript than what you hear, it's what you hear that's the evidence, not what you see in the transcript.  Everybody understand what I said?  Very good.  Thank you.

(*Id.* at 135.)

The Government also called Steven Galbadis, one of the federal agents who interviewed Petitioner at the Kittery police station, to testify at trial. (*Id.* 162–73.) Agent Galbadis testified that he did not have any control over the video recording system at the Kittery police station and believed it was operating the entire time, but he later discovered that portions of the interview were not captured in the recording. (*Id.* at 170–72.) On cross-examination, Agent Galbadis said that he understood that the recording system works on motion sensors and that the gaps in the recording were due to a lack of motion during portions of the interview. (*Id.* at 174–75.) On redirect examination, the Government played a copy of the video recording. (*Id.* at 177–81).

During their deliberations, the jurors sent several notes to the trial judge. In one of the notes, the jury asked, "Does the intention of the defendant to pick up the drugs at the home of [Gillis] (Opanas) as evidenced in the audio tape fall within the scope of the indictment charges?" The Government maintained that the appropriate answer to the question was "possibly" because it "may or may not be evidence of a conspiracy depending on what was the role in picking up the drugs." (*Id.* at 273–74.) Defense counsel argued that he "would answer no," because it was not itself within the scope of the charged conspiracy. (*Id.* at 274.) The Government also raised the possibility that one issue with the jury's question "may be timing because the event they're talking about falls outside the dates of the scope of the conspiracy and there may be a question of can – outside the scope of the conspiracy be evidence of intent to join the charged conspiracy." (*Id.* at 277.) The Court decided to respond by restating its instruction that the jury would need to determine

4

the scope and purpose of the charged conspiracy and if the defendant willfully joined the conspiracy based on the evidence of his words or actions. (*Id.* at 274–78.) Defense counsel did not object noting that the Court's approach essentially restated the instruction already given. (*Id.* at 278.)

The jury found Petitioner guilty. (Jury Verdict, ECF No. 67). In May 2016, the Court sentenced Petitioner to 100 months in prison. (Judgment, ECF No. 86.) The First Circuit affirmed the conviction in September 2017. *Corbett*, 870 F.3d at 24.

## C.   Postconviction Proceedings

Petitioner's arguments during the postconviction proceedings focused primarily on the two recordings introduced at trial: the video of the interrogation in Kittery and the audio of the conversation in Petitioner's vehicle. Regarding the interrogation video, Petitioner testified that the two agents made racist comments to him during the Kittery interview. (*See also*, Corbett Declaration at 1–3, ECF No. 121-4.) Petitioner claims to have told his trial attorney about the alleged comments and that he was assured that his attorney would investigate the issue. (*Id.* at 4–5.) Petitioner asserts that when he reviewed a copy of the video recording before trial, he immediately noticed that it was incomplete and that the statements were missing from the recording. (*Id.* at 5.) Petitioner reports that his attorney relayed the Government's explanation about the motion detection equipment and said that while he advised against it, if Petitioner wanted to press the issue regarding the racist comments, Petitioner would have to testify at trial. (*Id.* at 5–6.)

Petitioner presented an expert evaluation of the Kittery police department recording equipment and the copy of the video that was introduced at trial. (Garneau Declaration,

ECF No. 121-3.)   Based on the fact that the file format was a generic WMV video apparently made using a screen capture of the Milestone software, rather than Milestone's XProtect export format, and based on the fact that some of the gaps in the video occurred while there was some degree of motion, Petitioner's expert concluded that portions of the video had been redacted.  (*Id.*)  The Government obtained an analysis of the same WMV video file, which analysis could not rule out redaction.  (ECF No. 145-1.)  The Court determined that an evidentiary hearing was necessary to resolve the disputed issues regarding the audio and video recordings.

During the post-conviction proceedings, the Government discovered a copy of a disk it maintained was sent to defense counsel during pretrial discovery, which disk contained an unconverted copy of the video recording in Milestone's proprietary XProtect format.  (ECF No. 159-6.)  Petitioner moved to exclude the newly discovered evidence, (Motion, ECF No. 160), and after a preliminary hearing and arguments on the evidentiary issue, the Court denied Petitioner's request.  (Order, ECF No. 163.)

The Court held an evidentiary hearing on August 26, 2020.  (Hearing, ECF No. 191.)  The Government called John Brosnihan, a former officer of the Kittery Police Department, to testify about the station's Milestone recording system.  Officer Brosnihan explained that the system was set up in 2013, and that the system used motion sensing to capture automatically and save interrogations.  Officer Brosnihan or another officer would export recordings to disks.  According to Officer Brosnihan, after a server crash and several complaints about video recordings cutting out if individuals did not move enough during the course of interrogations, the Kittery Police Department changed to a system utilizing a

6

manual on and off switch in 2015.  Agent Galbadis denied that either of the agents in the interrogation made any of the alleged comments about Petitioner's race.  Agent Galbadis and Officer Brosnihan denied having made any intentional redactions of the video recording.

A Milestone employee, Josh Hendricks, testified that recording systems are sometimes set up using motion capture, which involves computer algorithms that sense movements based on a sufficient number of pixels changing from one set of frames to the next.  Because there are programmed change thresholds that must be exceeded, when individuals in the frame only exhibit small movements, the motion sensing recording system might not be engaged.  Hendricks believed that it would be exceedingly difficult for an unknown individual to modify a recording in the XProtect proprietary format to redact portions of the recording.  According to Hendricks, it would take inside knowledge of the proprietary software, which is limited to a small number of current and former employees, or considerable technical programming knowledge to reverse engineer their code.

Petitioner played at the hearing portions of four versions of the audio recording captured during the conversation between Gillis and Petitioner in his car just before his arrest.  The four versions included one unmodified WMA file and three MP3 files that had been "filtered," or digitally altered, in an effort to remove some of the noise from the radio obscuring portions of the conversation.  When counsel played portions of the four audio files, Petitioner testified that he was unable to discern the words contained in the transcript for the corresponding time frame of the audio recording.

As a result of a question as to which of the various digital audio files the government played for the jury at trial, in November 2020, the Court heard additional evidence and argument from both parties concerning the audio trial exhibit. The original prosecuting attorney, Assistant United States Attorney Daniel Perry, testified that he was familiar with the evidence and exhibits from the trial and identified the compact disk introduced in evidence and played for the jury. Attorney Perry explained that the version of the recording that was introduced at trial was the unenhanced audio from one of two recording devices Gillis wore during the conversation with Petitioner.

## DISCUSSION

### A.    Legal Standards

A person may move to vacate his or her sentence on one of four different grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction" to impose its sentence; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); *see Knight v. United States*, 37 F.3d 769, 772 (1st Cir. 1994).

The burden is on the section 2255 petitioner to establish by a preponderance of the evidence that he or she is entitled to section 2255 relief. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998); *United States v. DiCarlo*, 575 F.2d 952, 954 (1st Cir. 1978). When "a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned

during previous proceedings and make findings based thereon without convening an additional hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993).

A collateral challenge is not a substitute for an appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *Berthoff v. United States*, 308 F.3d 124, 127 (1st Cir. 2002). "Accordingly, a defendant's failure to raise a claim in a timely manner at trial or on appeal constitutes a procedural default that bars collateral review, unless the defendant can demonstrate cause for the failure and prejudice or actual innocence." *Berthoff*, 308 F.3d at 127-28.

An allegation of ineffective assistance of counsel may excuse a procedural default, but only if the petitioner demonstrates both that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). A district court reviewing a claim of ineffective assistance of counsel need not address both prongs of the test because a failure to meet either prong will undermine the claim. *Strickland*, 466 U.S. at 697. If a petitioner's "claims fail on the merits, his related claims that counsel rendered ineffective assistance in failing to press the claims at trial or on appeal must also fail." *Tse v. United States*, 290 F.3d 462, 465 (1st Cir. 2002) (per curiam).

A criminal defendant may move for a new trial based on newly discovered evidence. Fed. R. Crim. P. 33(b). To obtain a new trial, a defendant must show (1) that the evidence in question was unknown or unavailable at the time of trial; (2) that the failure to discover the evidence sooner was not due to the defendant's own lack of diligence; (3) that the evidence is material and not merely cumulative or impeaching; and (4) that introduction of

the evidence at a new trial probably would result in an acquittal. *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007). However, if the evidence is merely impeachment, but the movant demonstrates that the government suppressed the evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the fact the evidence is merely impeachment does not preclude a new trial, and the third and fourth elements of the test are replaced with a more lenient standard requiring only that the movant persuade the court that there is a reasonable probability that timely disclosure of the evidence would have yielded a different result at trial. *United States v. Connolly*, 504 F.3d 206, 212 – 13 (1st Cir. 2007). The lower standard is met if the evidence undermines the court's confidence in the jury's verdict. *United States v. Peake*, 874 F.3d 65, 69–70 (1st Cir. 2017).

Under either approach, a court is free to weigh the evidence and evaluate the credibility of the witnesses at trial and the credibility of any witness whose testimony the movant introduces as new material evidence. *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980).

## B.     Video Recording

Petitioner asks the Court to invalidate his conviction based on law enforcement's alleged intentional alteration of the video recording and the failure of counsel to investigate the creation of the recording or to impeach Agent Galbadis concerning the alleged racist comments. Petitioner also seeks a new trial based on the newly discovered evidence regarding the alleged alteration of the video recording and the Government's alleged withholding of the evidence.

While there is "no general constitutional right to discovery in a criminal case," a defendant's constitutional right to due process "requires the Government to disclose any exculpatory evidence which is 'material either to guilt or to punishment,'" including impeachment evidence of key government witnesses. *United States v. Rivera-Hernandez*, 497 F.3d 71, 79 (1st Cir. 2007) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and discussing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

### 1.    Proposed Findings of Fact on Video Recording

Based on the evidence at the hearing, I recommend the Court find the following facts:

a.   Officer Brosnihan's testimony about the motion-based configuration of the recording system at the Kittery Police Department at the time was credible and uncontroverted.

b.   Josh Hendricks's expert testimony regarding the difficulty of manipulating the video evidence in the proprietary format was credible and uncontroverted.

c.   The ellipses during the video recording were most likely caused by insufficient movement for the system to recognize and save all the data and were not intentionally created by law enforcement.[1]

d.   Because the motion-based ellipses happened due to a lack of movement in the room, including Petitioner's lack of movement, the likelihood that the ellipses

---

[1] Because the XProtect version of the video recording is more probative on the questions of manipulation and redaction of the video, there is no reason to give any weight to Petitioner's expert's conclusions concerning the WMV recording that was apparently made later from that XProtect version in preparation for trial.

corresponded with the exact moments when law enforcement officers made racist comments is extremely remote.

e.  Agent Galbadis's denials that anyone made racist comments were credible.

f.  Because the alleged racist statements are not reflected on the video recording, and because the ellipses in the recording were not intentional and likely did not coincidentally occur when the alleged statements were made, the agent's denials are more credible than Petitioner's assertions concerning the comments.

### 2.    Conclusions of Law

Given the factual findings, Petitioner has not established that had his attorney investigated Petitioner's assertions, his attorney would have discovered any evidence to corroborate Petitioner's contention that the officers made the statements.  An investigation, therefore, would not have generated any material trial evidence. The results of the postconviction investigation ultimately confirmed the advice of trial counsel that Petitioner would have had to testify if he wished to raise those allegations.

Because Petitioner has not established that any *Brady* or *Giglio* material was withheld, and because further investigation into the video recording before trial would not have generated any material evidence for the defense, Petitioner has failed to establish a basis for a new trial, that counsel performed deficiently, or that Petitioner was prejudiced by counsel's decision not to pursue the issue further.

### C.    Audio Recording and Transcript

Petitioner contends that his attorney provided ineffective assistance at trial when he did not object to the introduction of the audio recording and to the use of the transcript.

"The government has the duty of laying a foundation that the tape recordings accurately reproduce the conversations that took place, *i.e.*, that they are accurate, authentic, and trustworthy. Once this is done, the party challenging the recordings bears the burden of showing that they are inaccurate." *United States v. Carbone*, 798 F.2d 21, 24 (1st Cir. 1986). When a recording contains inaudible segments, the law "provides that where a recording is challenged on the grounds of inaudibility the question is whether the inaudible parts are so substantial as to make the rest more misleading than helpful." *United States v. Panzardi-Lespier*, 918 F.2d 313, 318 (1st Cir. 1990) (internal quotations omitted). A composite recording is admissible, as is "a recording that has been enhanced to improve its audibility by filtering out background noises and improving the clarity of the voices," as long as the recordings are properly authenticated. *Carbone*, 798 F.2d at 24.

### 1.   Proposed Findings of Fact on Audio Recording and Transcript

Based on the evidence at the hearing, I recommend the Court find the following facts:

    a.  During the encounter between Gillis and Petitioner, there were two devices that recorded the conversation. One of the devices had to be turned on and "run" from the time Gillis left the law enforcement agents to meet with Petitioner. The other was in Gillis' boot, which was run remotely by the law enforcement agents.

    b.  One of the devices was closer to the speakers of the radio and thus the recordings from that device are more difficult to decipher.

    c.  Substantial portions of the versions of the audio recordings played during the postconviction hearing in August 2020 were difficult to decipher, and the

transcript cannot reasonably be construed to reflect those versions of the recordings.

d. Attorney Perry credibly testified, and Petitioner did not contradict, that the disk produced by the Government and discussed by the parties during the November 16, 2020, hearing was the audio exhibit introduced at trial (Trial Exh. 6, Nov. 2020 Hearing Exh. 1) and returned to the Government after conclusion of the direct appeal.

e. The recording (Trial Exh. 6) is of much higher quality than the recordings played during the postconviction hearing in August 2020. This recording (Trial Exh. 6) was likely derived from the device that was not as close to the radio speakers.

f. While trial exhibit 6 includes some portions that are difficult to discern, other portions of the recording are reasonably complete and audible. The portions that cannot be discerned are designated in the transcript as unintelligible.

g.  The transcript used by the jury to follow the recording played at trial was created with input from multiple individuals, including Ms. Gillis, Agent Clifford, and an interpreter.

h. In the process of creating the transcript, some of the individuals likely listened to the original recording and an "enhanced" audio recording.

i. Before offering the final transcript as an aid to the jury, Agent Clifford reviewed the transcript and trial exhibit 6 and certified that the transcript accurately reflected the audio played for the jury.

14

j.   A review of the content of the recording (trial exhibit 6) and the transcript confirmed that the final transcript used by the jury reasonably reflected the audio recording.

### 2.   Conclusions of Law

Given the factual findings, the Court did not err in admitting the recording. Although portions of the trial version are inaudible, significant portions are discernable, including some portions that were highly probative. *See United States v. DiSanto*, 86 F.3d 1238, 1254 (1st Cir. 1996) (upholding decision to admit recording despite inaudible portions because some "segments are relevant because they include, *inter alia*, admissions by [the defendant], tending to show consciousness of guilt and corroborate trial testimony"); *United States v. Nashawaty*, 571 F.2d 71, 75 (1st Cir. 1978) ("The audibility of the tape was poor, but enough of the conversation was audible and relevant to the purpose for which it was admitted").   A jury could reasonably discern material portions of the recording to make the recording as a whole more helpful than misleading.   Petitioner's argument—that the recording is more misleading than helpful because the inaudible portions contain important "context"—is therefore unpersuasive.   Indeed, Petitioner has not identified which inaudible portion of the recording generates confusion or generates a contextual concern.   Because Petitioner's proposed audibility objection lacks merit, trial counsel did not perform deficiently when he failed to raise it at trial, and Petitioner was not prejudiced by that decision.

Petitioner also contends that his attorney provided ineffective assistance at trial by failing to object to the use of the transcript as an aid for the jury.   Courts routinely approve

the "use of transcripts as aids to the jury, provided the court makes clear to the jury that the tape rather than the transcript constitutes the best evidence." *United States v. Morales-Madera*, 352 F.3d 1, 7 (1st Cir. 2003). A transcript should be as accurate as possible, and a party may not "customiz[e] the transcript to reflect its own theory of the case." *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 17 (1st Cir. 1997). "Sound trial management and considerations of fairness" teaches that it is advisable for the Government to provide copies of transcripts in advance of trial, and:

> if the defendant believes the transcription of the tape is in error as to what was said, then the dispute should be brought to the attention of the court. Usually, the judge either makes a determination as to the correct transcription after listening to the tape or determines that the dispute is an issue of fact for the jury to decide.

*Morales-Madera*, 352 F.3d at 7–8.

Although the Government should have provided the transcript to the defense in advance of trial, rather than at trial, Petitioner has not established any prejudice from the timing of the disclosure because he has not shown a reasonable likelihood that a contemporaneous objection or submission of an alternate transcript would have made a difference at trial. Petitioner has not challenged any specific content of the transcript. That is, Petitioner has not claimed any specific material errors in the transcript or that the transcript includes statements that he or Gillis did not make.

Petitioner also challenges his counsel's performance and the use of the transcript based on the possibility that one or more of the "enhanced" versions of the recording were used to create the transcript, which process would be in tension with or contrary to the Court's pre-trial ruling that the "enhanced" recording was inadmissible. The exact role of

16

the enhanced recordings in the creation of the transcript is uncertain.  The creators of the transcript likely reviewed at least one enhanced version of the recording during the process of creating the transcript, (*see* 2255 Exhibit A at 4–6, ECF No. 121-2), but how the "enhanced" version assisted in the preparation of the transcript is unknown.  Not insignificantly, the quality of the recording introduced at trial was generally higher than the quality of the "enhanced" recordings presented during the postconviction hearing.  The trial exhibit, which was not an "enhanced" recording, was likely the most helpful source in the preparation of the transcript.  Even if an "enhanced" version was used to help create the transcript, the record lacks any evidence to suggest that an "enhanced" version allowed the Government to include in the transcript content that was not evident when listening to the audio recording presented at trial (Trial Exh. 6).

Perhaps more importantly, Petitioner has not demonstrated why the source or sources of the transcript is determinative.  As the Court instructed the jury, the evidence was what the jury heard on the recording; the relevant inquiry, therefore, is whether the transcript accurately reflected what a listener could discern from the trial exhibit.  *See DiSanto*, 86 F.3d at 1253 (emphasizing the fact that "the district court gave a cautionary instruction to the jury that not only informed them that the tapes, but not the transcript, were evidence, but also that the jurors had to draw their own conclusions regarding their content and probative value based on what they themselves heard on the tapes").  As a foundation for the use of the transcript, the Government had to and did establish through testimony that the transcript fairly and accurately reflected the content of the audio recording.  Petitioner does not cite, and a review of the audio trial exhibit and the transcript

does not reveal, any material transcription errors. Petitioner thus has not established that trial counsel performed deficiently when he did not object to the use of the transcript, nor has Petitioner demonstrated that he was prejudiced by counsel's performance.

## D.     Jury Instructions

Petitioner argues his trial attorney provided ineffective assistance because he did not seek a more specific instruction in response to the jury note about the scope of the conspiracy. Because "a conspiracy conviction is not possible if the defendant conspired only with government agents or informants," *United States v. Nelson-Rodriguez*, 319 F.3d 12, 39 (1st Cir. 2003), Petitioner argues the charged conspiracy ended prior to the conversation with Gillis in Petitioner's car and defense counsel should have asked the Court to instruct the jury more specifically about the termination of the conspiracy.

Petitioner's statements to a coconspirator-turned-government-agent following the termination date of a conspiracy, however, can be highly probative of a prior conspiracy and Petitioner's participation in that conspiracy. When Gillis and Petitioner discussed Gillis' debt and Gillis' varied success selling different types of pills, Petitioner's apparent agreement to pick up Opanas the following day was highly probative of a course of conduct or prior conspiracy, even if that conspiracy was technically terminated without Petitioner's knowledge before the conversation. A reasonable attorney could have declined to request a more involved instruction as it likely would not have been given or, if given, made a difference. In fact, given that the Court rejected defense counsel's request that the Court answer the jury's question "no," even if counsel had argued for a more specific instruction, the Court would not have simply instructed the jury that the agreement to pick up Opanas

18

was outside the scope of the conspiracy.  Instead, if the Court had elected to provide a more specific instruction and explained that the jury could not convict based on an agreement to traffic drugs in the future, the Court would likely have also explained that the jury could consider Petitioner's statements in determining whether a previous conspiracy existed. Petitioner, therefore, has not established that the Court would have given a more specific instruction or, if given, that the complete instruction would have benefited him. Accordingly, Petitioner has not shown that counsel performed deficiently, or that he was prejudiced by counsel's decisions.

Petitioner also faults his trial attorney for not requesting a more specific jury instruction concerning accomplice testimony.  The First Circuit has noted:

> [C]ourts long have recognized the special pitfalls that accompany accomplice testimony. In an appropriate case, a criminal defendant is entitled, upon timely request, to an instruction that calls the jury's attention to these dangers. There are, however, no magic words that must be spoken in this regard.

*United States v. Paniagua-Ramos*, 251 F.3d 242, 245 (1st Cir. 2001) (internal citation omitted).  The Court, using the District's model jury instruction, cautioned the jury about the testimony of Gillis and Gerrish, who testified under agreements with the Government and under a grant of immunity.  (Trial Transcript at 255.)

Petitioner maintains his attorney should have requested an additional instruction admonishing the jury that it should not convict Petitioner unless the jurors "believe beyond a reasonable doubt that the testifying accomplice is telling the truth."  *See Paniagua-Ramos*, 251 F.3d at 247 (modification omitted); *United States v. Dailey*, 759 F.2d 192, 200 n.8 (1st Cir. 1985).  The *Paniagua-Ramos* and *Dailey* courts "did not, however, intimate

19

that those precise instructions were obligatory." *Paniagua-Ramos*, 251 F.3d at 248. Although the First Circuit noted that "it would be advisable" to admonish the jury "that the testimony must be believed beyond a reasonable doubt" in a case "where the accomplice's uncorroborated testimony is the only evidence of guilt," *id.* at n.3, the First Circuit concluded:

> [I]n many cases, the *Dailey* language will not be appropriate. It is bedrock principle that, in the ordinary case, a jury need not believe every government witness beyond a reasonable doubt in order to conclude that the defendant is guilty beyond a reasonable doubt-and *Dailey* did not venture to alter that principle.

*Id.* at 248. Because in this case there was admissible corroborating evidence in the form of law enforcement testimony and recordings, *see supra*, Petitioner has not established that the Court would have given the instruction if requested, as the requested instruction did not most accurately state the applicable law. Because the Court likely would not have given the instruction, Petitioner has not established that his counsel performed deficiently regarding the instruction or that he was prejudiced by his counsel's performance.

## CONCLUSION

Based on the foregoing analysis, I recommend that the Court adopt the proposed findings of fact and conclusions of law set forth herein; that the Court deny Petitioner's motion for habeas relief under 28 U.S.C. § 2255; that the Court deny Petitioner's motion for new trial; and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2255 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of November, 2020.